**Murray PRICE and Willie Bradwell, Plaintiffs,**

v.

**The MARYLAND CASUALTY COMPANY and American General Insurance Company, Defendants.**

**Civ. A. No. 4845.**

United States District Court,
S. D. Mississippi,
Jackson Division.

April 3, 1975.

See also, D.C., 62 F.R.D. 614.

Dixon L. Pyles, Jackson, Miss., for plaintiffs.

Thomas H. Watkins, Jackson, Miss. and Bernard Marcus, New Orleans, La., for defendants.

### OPINION OF THE COURT

DAN M. RUSSELL, Jr., Chief Judge.

On March 9, 1971, Murray Price, a resident of Jackson, Mississippi, filed a civil action for injunctive relief and damages by virtue of the provisions of the Age Discrimination in Employment Act, 29 U.S.C. #621 et seq. and also for pendent common law conspiracy and breach of contract against Maryland Casualty Company, a Maryland insurance corporation, herein called Maryland Casualty, and American General Life Insurance Company, a Delaware insurance corporation, herein called American General, both alleged to be doing business in Mississippi. Jurisdiction was invoked pursuant to 28 U.S.C. #1331 and 1343 (3), and 29 U.S.C. #626(c). Plaintiff also joined some 26 Mississippi insurance agents as resident attachment defendants, subsequently dismissed from the suit upon the appearance of the principal defendants. Plaintiff, born July 4, 1914, was, until December 31, 1970, a marketing representative "A" employed by Maryland Casualty in its Jackson, Mississippi office. Plaintiff claims that on August 4, 1970, he was directed to apply for early retirement, and, when he refused, was involuntarily retired on De-

cember 31, 1970, on account of his age in violation of the aforesaid Act. He was 56 years old at the time.

Following Maryland Casualty's answer denying all material allegations of the complaint, plaintiff, on June 15, 1971, moved for leave to file an amended complaint seeking to add Willie L. Bradwell as a named plaintiff and a class of all employees of the defendants between the ages of 40 and 65 years of age who had been discharged or compelled to accept early retirement from the employ of the defendants in violation of 29 U.S.C. #621, and as a result of a civil conspiracy, and because of a breach of the employment contract between the defendants and individual members of the class. This motion was noticed for August 2, 1971, and heard on September 7, 1971 at which time the Court directed that Willie L. Bradwell be allowed to intervene as a plaintiff on a stipulation that he had given notice of his intent to sue as required by Section 626(c) and (d)· of the Act. · No order was furnished by plaintiff, as it should have been, nor did the Court rule on the class action feature. Despite this plaintiff undertook to depose, in Jackson, six executives alleged to be representatives of both defendants, all with Baltimore, Maryland addresses, who were to bring with them to Jackson all minutes of the board of directors and executive bodies, memoranda, directives, correspondence, documents and financial records relative to the discharge or early retirement of all employees between the ages of 40 and 65 years of age from and after January 1, 1968. Defendants moved for a protective order to require plaintiff's counsel to depose these executives by written interrogatories, or, alternatively, to take their depositions at their principal places of business in Baltimore, El Paso, Texas, and Los Angeles, California, and to require plaintiff's counsel to confine his interrogatories to facts and documents pertaining to plaintiff Murray Price, only, until such time as the Court ruled on plaintiff's motion to proceed on behalf of a class. Upon a hearing on de-

fendants' motion this Court, on June 1, 1972, directed that counsel for plaintiff not be required to take the depositions of the persons proposed on written interrogatories but could take the proposed depositions of those executives of Maryland Casualty at the home office in Baltimore, deferring the taking of depositions of representatives of American General, not yet designated, until a later date, and directing that the officers and representatives of Maryland Casualty not be required to furnish information or documents pertaining to former employees of Maryland Casualty other than Murray Price until such time as the Court authorized plaintiff to proceed with a class action. Notwithstanding this order, and again prior to any order designating the action as a class action, plaintiff, on September 5, 1972, noticed unnamed representatives of American General to be present two days later in Houston for depositions examining American General on policies of both defendants with respect to the discharge and early retirement of employees of both defendants and detailed information relating to employees who have been discharged or who received early retirements since June 28, 1968, and for such representatives to bring with them minutes of the board of directors and executive bodies, memoranda, directives, correspondence, documents and financial records relative to the discharge or early retirement of employees between the ages of 40 and 65 years from and after January 1, 1968. Further, that each of the witnesses bring "all statements, documents, letters, memoranda, contracts, and personnel records having to do with the subject matter of this action and reasonably calculated to lead to the discovery of admissible evidence thereasto." Defendants again sought a protective order, seeking at least six days' notice for the taking of depositions in Houston and Baltimore, and again seeking to require plaintiff's counsel to confine his interrogatories to facts pertaining to Murray Price only until such time as the Court authorized the action to proceed on be-

half of a class. On September 27, 1972, this Court issued its written opinion on the propriety of a class action herein, finding that, inasmuch as 29 U.S.C. # 626(d) prohibits the filing of an action by an individual who has not first given the Secretary of Labor 60 days' notice of his intention to sue, the class should be limited to those individuals, similarly situated to Price, who had filed the required notice with the Secretary within 180 days after the alleged unlawful act, unless this statutory condition be affirmatively waived, and who have filed their written consent in this action to become a party plaintiff. An order was furnished by defendants and entered of record permitting the joinder of Willie L. Bradwell as a named plaintiff conditioned upon his showing of record that he filed the required notice of his intent to sue within the prescribed time. The order also provided that the action now be limited to those individuals, similarly situated to Price, who have both filed the required notice with the Secretary of Labor within 180 days after the alleged unlawful practice and filed their written consent to become a party plaintiff, unless these conditions be affirmatively waived by the defendants.

On February 6, 1973, plaintiff moved to substitute "The American General Insurance Company," a Texas corporation, in the place and stead of "The American General Life Insurance Company," the former co-defendant, on the grounds that, after discovery, plaintiffs had determined the former to be the parent or holding company of Maryland Casualty, that the Texas corporation was a joint employer with Maryland Casualty of the plaintiffs, and conspired with Maryland Casualty to bring about the early retirement of plaintiffs because of their age, and breached the employment and retirement contracts with plaintiffs. In their motion, plaintiffs alleged that, although American General Insurance Company, henceforth also referred to as American General, had not qualified to do business in Mississippi, it had done and is doing business in Mississippi, has entered into contracts in Mississippi with Mississippi citizens to be performed in whole and in part in Mississippi, and by breaching said contracts, is subject to service of process under the Mississippi "long arm" statute. Plaintiffs, in the motion, also sought to file an amended complaint by adding specific allegations against American General. Defendants, in response to the motion, made no objection to the substitution of the co-party defendant, but denied that American General is doing business in Mississippi or is subject to process, and denied the proposed added allegations.

Again without the entry of an order allowing the amendments, which should have been furnished by plaintiffs, plaintiffs filed a comprehensive amended complaint against both Maryland Casualty and American General, alleging both to be employers within the meaning of 28 U.S.C. # 630(b) (the Court feels sure that plaintiffs meant *29* U.S.C. # 630(b)). Attached to the amended complaint is a copy of a notice by Price, dated December 8, 1970, to the Secretary of Labor of his intention to sue Maryland Casualty for violations of Section 7(d) of the Age Discrimination Act, 29 U.S.C. # 626(d). Also attached is a copy of a letter dated February 22, 1971 from the Jackson, Mississippi, Area Director of the Wage and Hour and Public Contracts Division of the U. S. Department of Labor, to Price, alleging the receipt of information that Price believed he was terminated by Maryland Casualty because of his age, advising Price that conciliation efforts had been unsuccessful, and advising that the period during which Price could file the required notice of intent to sue had expired. It is obvious from the language of the Area Director that his letter is not responsive to Price's letter. Be that as it may, the Court has not questioned at any time that Price failed to give the Secretary his notice of an intent to sue within the time provided by Section 626(d)(1). The amended complaint also avers that on June 3 and 5, 1971, plain-

tiff Bradwell notified the Secretary of Labor of his intent to sue Maryland Casualty. Although no copies of the notices are attached to the amended complaint, there is attached a copy of a letter dated July 29, 1971, from the Area Director of Columbia, South Carolina, to Bradwell, acknowledging receipt of his notices and advising that conciliation efforts on his behalf had failed. Although making certain factual allegations against both defendants, plaintiff Price, under Count I relating to alleged violations of 29 U.S.C. # 623(a) and (d) sought relief against Maryland Casualty only, namely, reinstatement to his former employment; back wages, including increases he would have received beginning January 1, 1971; liquidated damages in an equal amount; an injunction restraining Maryland Casualty from further discriminating against Price on account of his age; and attorney fees and costs. In Count II, Price sought compensatory and punitive damages against both defendants for a civil conspiracy, the illegal object of which was to terminate his employment with Maryland Casualty and to deprive him of contractual benefits. For relief he sought compensatory and punitive damages against both defendants, jointly and severally, and attorney fees and costs, and the reinstatement of all employment benefits. Bradwell's allegations are directed solely to Maryland Casualty. He asserted no conspiracy charges against American General, and his requested relief was directed only to Maryland Casualty, namely, actual and punitive damages; reinstatement of all employment benefits; attorney fees and costs.

The Court notes that process under the amended complaint, while directed to the Secretary of State for service on American General Insurance Company, is evidenced by a return receipt from "American General Life Insurance Co." Nonetheless, American General Insurance Company responded to the process by filing a motion to dismiss for lack of in personam jurisdiction, alleging lack of valid service of process, denying that it is doing business in Mississippi, denying that it has made any contracts in whole or in part with either plaintiff in the State of Mississippi, or has committed a tort against either in whole or in part, and denying that either plaintiff has ever been an employee of American General. The motion was supported by the affidavit of George F. Reed, vice president and general counsel of American General. Plaintiffs responded to this motion with a counter-affidavit of plaintiff Price to the effect that when American General purchased the majority and controlling stock of Maryland Casualty both defendants became his joint employers by virtue of his salary checks paid by American General, and by virtue of various contractual benefits, including stock purchases, extended by American General; that both discriminated against the affiant because of his age and in doing so committed tortious acts in the State of Mississippi. The Court in rendering a written opinion, dated June 6, 1973, on the motion to dismiss, reviewed the entire Court file, including 11 depositions with numerous exhibits attached thereto, and found that plaintiff Bradwell had made no allegations against the movant, nor did he file a counter-affidavit or any other response to American General's motion to dismiss for lack of proper process, and accordingly sustained the motion to dismiss American General as to plaintiff Bradwell. The Court now additionally notes that Bradwell, a non-resident of the State of Mississippi, is not a beneficiary of Mississippi's long arm statute enacted for the benefit of Mississippi residents. The Court also found that Maryland Casualty was plaintiff Price's employer, not the parent company, American General. However, the Court denied the motion to dismiss with respect to Price's allegations based on conspiracy. Following an order entered on this opinion, American General filed its answer to the amended complaint, denying the in personam jurisdiction of the Court; denying that the amended complaint stated a cause of ac-

tion; admitting that plaintiff Price became an employee of Maryland Casualty on March 31, 1956, eventually being classified as a marketing representative "A"; admitting that plaintiff Price was placed involuntarily in early retirement status by Maryland Casualty; and denying all other material allegations of the amended complaint, and particularly denying that plaintiff was discriminated against because of his age or that he is entitled to any of the requested relief. On August 23, 1973, on request of the plaintiffs, the Court extended the time in which to complete discovery to December 15, 1973. Despite this extension, plaintiffs waited until May 13, 1974 to notice the taking of a deposition of undesignated representatives of American General in Houston, Texas, leading toward the same type discovery previously sought, i. e., *all* records pertaining to the termination of all persons between the ages of 40 and 65 since January 1, 1968, and the reasons therefor. On June 11, 1974, defendant, American General, designated a senior vice president as its representative for the deposition in Houston, the designation being subject to all restrictions heretofore entered with respect to the nature, scope and issues of this action.

On July 31, 1974, a pre-trial conference was held at which time the parties were formally notified to be prepared for trial, the time for further motions and discovery long having lapsed. The Court notes that from the time this Court ruled on the class action, September 27, 1972, until the eve of trial, not once did plaintiffs address discovery to the proper defendants for information reasonably calculated to lead to the discovery of admissible evidence as provided under FRCP Rule 26(b); instead plaintiffs attempted to shift this burden to the defendants, seeking such a volume of discovery documents as to be burdensome, and as to which defendants properly sought protective orders. On Sep-

tember 4, 1974, plaintiffs moved the Court to require defendants to furnish detailed information, described on eight legal size sheets, and addressed to five executive employees of Maryland Casualty whom plaintiffs had deposed, the requested information, if possible, being more comprehensive than any previously requested. To have allowed this discovery, the Court would have had to continue the case, one of the oldest, if not the oldest, case on the docket. Even had some of the proposed discovery been shown to be appropriate, the Court would have denied the motion on the grounds that plaintiffs had been inexcusably dilatory in not completing appropriate discovery within the normal discovery time of ninety days, in this case repeatedly extended to a final date of December 15, 1973,[1] more than two years after the filing of the complaint. Nor did plaintiffs waive a jury trial until a pre-trial conference was held on July 31, 1973. The action finally went to trial on September 16, 1974, requiring five full days of trial time, even in the absence of plaintiff Bradwell, who did not appear for trial, and as to whom the Court has no recourse but to dismiss him from the case.

Plaintiff, Murray Price, a native of Jackson, Mississippi, testified that he was born on July 4, 1914, making him 56 years old at the time of his involuntary early retirement with Maryland Casualty on December 31, 1970. On May 1, 1947, he was employed in Jackson by Black Rogers & Company, an insurance partnership which served as Maryland's general agent in Mississippi and Louisiana. Price's title was special agent or marketing representative, serving local agents in Mississippi who market Maryland Casualty's insurance contracts to the public. Plaintiff's territory was the entire state except for nine counties in the northeast corner of the state. In 1951 he became a junior partner in Black Rogers. In 1952 Black

---

1. Even after this date, with the consent of the defendants, plaintiff deposed a designated representative of American General on June 18, 1974, which defendant had nothing to do with the termination of Maryland Casualty employees.

Rogers, employed Lee Mansell as a second marketing representative, plaintiff claiming that he was responsible for Mansell's employment. On March 1, 1956, Black Rogers was sold to Maryland Casualty, including plaintiff's interest, after which Price, under a signed contract with Maryland until 1964, and Mansell became marketing representatives for Maryland Casualty covering the entire state, except for the same nine northeastern counties and the three Gulf Coast counties which were served by a Maryland marketing representative out of New Orleans, Louisiana. Both plaintiff and Mansell worked out of the Jackson office, covering their territory by automobile. Plaintiff said that Black Rogers initially sent him to Maryland Casualty for a training course lasting six weeks, and that he attended other courses offered by Maryland Casualty until it was purchased in 1964 by American General. Other than Company courses, plaintiff studied law at the Jackson School of Law and was licensed by the state. He also took a Dale Carnegie course in public speaking and attempted to train himself in underwriting. Plaintiff stated that, in 1964 when American General, a parent or holding company for a number of insurance companies, took over Maryland Casualty, he was assured of continued employment, although without a written contract, and his duties remained the same until Wayne Campbell, a trained underwriter, was sent to Jackson on March 1, 1967, to become the office manager. Prior to the advent of Campbell, plaintiff had office duties and worked a territory where he could get home at night with Mansell doing most of the traveling.

Lucien L. Lucas, a Maryland Casualty vice president in Baltimore, was in charge of the New Orleans branch from 1964 to 1970. One of his predecessors in the New Orleans office was H. H. Bremmerman, now in Baltimore, who during his assignment in New Orleans was over Price. Plaintiff, upon being advised by Lucas in February 1967 that Campbell was being assigned to Jackson, wrote to Bremmerman complaining that he, plaintiff, should have been given Campbell's job. Plaintiff's letter was offered in evidence, and he was permitted to testify as to Bremmerman's telephonic reply to the effect that Bremmerman could do nothing about Campbell's assignment and for plaintiff to try to get along with Campbell. Before Campbell came to Jackson, Mansell and plaintiff underwrote insurance which had to be approved by the New Orleans office. After Campbell's advent, plaintiff was assigned all of Mansell's territory except the agencies in Vicksburg and Meridian, and Mansell began underwriting property insurance for agencies inside the city of Jackson, while Campbell performed the casualty insurance underwriting. Plaintiff claimed that he was capable of underwriting and would have done so if he had been directed to. He did underwrite bonds. Plaintiff also testified that during his entire employment with Maryland Casualty he was never told that his work was unsatisfactory, admitting only that occasionally he was told he could do better. On August 8, 1970, plaintiff was requested by Campbell to meet with Lucas, who had come to Jackson from New Orleans. Lucas and plaintiff had breakfast together at a downtown hotel, during which time Lucal told plaintiff that he had recently met with company officials in Baltimore and that Peterson, president of Maryland Casualty, and Bremmerman, then a vice-president, were merely figureheads, the company being run by American General out of Houston. After breakfast Lucas and plaintiff went up to Lucas' room where Lucas told plaintiff that Maryland Casualty was going to terminate plaintiff and that he would have until December 31, 1970, to take an early retirement. Plaintiff said that he did not ask why he was being terminated, although he thought it wrong, and that Lucas' explanation was that there was not enough business in Jackson to justify three men there, and that plaintiff was the least valuable. Lucas also said that Warren Zapp, head of the mar-

keting division in the home office, had not been impressed with Price on a trip Zapp had made to New Orleans for the purpose of evaluating all the market representatives in Mississippi and Louisiana. Price acknowledged that Lucas offered to help him in seeking other employment. After receiving his notice, Price asked Lucas for a transfer. According to Price, Lucas said a transfer was "out" as Price had previously said he would never leave Jackson and a transfer had accordingly never been considered by Maryland Casualty. Although Price at the time of his notice said nothing more after being refused a transfer, at the trial Price said that in 1970 there was a vacancy in New Orleans which Campbell refused to take, and in 1971 he learned of other transfers in the New Orleans-Baton Rouge area involving market representatives. Plaintiff acknowledged that he had heard of no derogatory statements made about him by Maryland Casualty employees between August and December 1970. He learned of the Age Discrimination in Employment Act later, conferred with local Department of Labor officials, then wrote a notice of his intent to sue to the Secretary and received a right to sue letter. These communications have earlier herein been referred to, and it is sufficient to say that defendants, in their post trial brief acknowledged that Price complied with the procedural conditions for a private action under the Act.

Prior to plaintiff's testimony, his counsel introduced into evidence, by agreement of counsel, ten depositions taken of various company officials and employees; a copy of one of plaintiff's salary checks from the American General Group payroll account, a copy of a specimen check to the order of M. Price "Payable for Life-Beginning at Retirement" and showing a computation of $285.94, together with Social Security benefits of $146.63, for a total of $432.-57 monthly income due at age 65; a prospectus of American General Insurance Company's Employees Thrift Plan; and a statement detached from a salary check showing deductions from plaintiff's check applied to American General Group life insurance, major medical insurance, long term disability insurance, and thrift plan. Although barely commented on by plaintiff, these documents, other than the depositions, were obviously introduced to support plaintiff's allegations of a dual employer relationship, breach of contract by both defendants, and a conspiracy by both defendants to deprive plaintiff of contractual benefits.

Price's testimony under direct and cross-examination was lengthy. Further under direct, he acknowledged that he had refused to resign or accept early retirement and has received no retirement benefits. He has, as of February 2, 1971, obtained other employment as an insurance salesman with a Jackson agency. His salary is $700.00 per month and commissions on sales. His income has been as follows: 1971—$7067.00; 1972—$8693.00; 1973—$11,233.00, and 1974 to 8/31/74—$6,242.87. He claims to have expended the sum of $3,964.89 for expenses incurred in this suit, exclusive of attorney fees.

On cross-examination Price acknowledged that when Maryland Casualty bought out Black Rogers he was paid for his interest; he did not recall how much, but said he received $5,000.00 not to compete against Maryland Casualty, the payments extending over a period of 10 years. In 1961 Maryland Casualty increased its lines of insurance. As a marketing agent it was Price's job to call on insurance agencies to get them to sell more Maryland Casualty insurance policies. He also collected delinquent accounts. He decided with management which agencies to continue to do business with and he planted a number of new agencies in his Mississippi territory. In 1969 when Mansell began underwriting property insurance and plaintiff had been assigned most of Mansell's territory, Price said he was serving 39 agents. He did not recall how many of these agencies handled Maryland Casualty policies with premiums under

$25,000.00 per year, but admitted there were some. He stated that Ted Schmidt, the production manager in the New Orleans branch, some years prior to Lucas, was never specifically critical of his work, but admitted that Schmidt constantly urged him to produce more business without telling him how to do it. He admitted that in his application in 1956 to Maryland Casualty and in his yearly evaluations he had indicated he would not take a transfer, but said this was long before he learned his job was at stake. He admitted that in a deposition taken earlier he had stated that he had compiled an outstanding record with Maryland Casualty, and in addition to planting agencies, he was never late, never malingered, never chased women and followed instructions whether he agreed with them or not. He said all of this indicated his loyalty to the company, and that if Lucas had told him to jump in the river he would have done so. He said he meant it then and now. He recalled the private conference in New Orleans with Zapp in which they discussed the agencies Price serviced before taking over Mansell's territory. In response to Zapp's inquiry as to why Price did not produce a higher premium volume than $20,000.00 from certain of these agencies, Price said that he could not explain to Zapp that Mississippi had towns of only 500 to 700 population but that Bremmerman would have understood. He made no recommendations to Zapp concerning how he, Price, could improve sales. He said it was not his practice to say anything to the Baltimore officials. Instead he just listened and did what he was told to do. In refusing to take a voluntary early retirement or even to make a choice of whether he wanted his retirement benefits to begin on date of termination or be deferred to the normal retirement age of 65, he did admit that he knew the company could not deprive him of these benefits. He identified a letter written on his behalf by Lucas dated December 1, 1970, in which Lucas wrote "To Whom It May Concern" that Price was being placed on early retirement, a step necessary because of a decision to restrict the company's operations in the Jackson service office; that Price did not want to leave the Jackson area, and accordingly no consideration was given to a transfer. The letter closed with a statement that Price would make an excellent employee for any firm which operates in the State of Mississippi inasmuch as he is completely familiar with the state and its insurance conditions. Price also identified a copy of a letter he had written in 1961 to a Mr. Logue, a general insurance agent in Memphis for companies other than Maryland Casualty, turning down a job offer in which Price stated that he had come to the conclusion that he could not leave Maryland Casualty, saying " . . . . I am too old and too weak to start over again . . . All I want to do is just keep what I have until retirement comes around . . . . I plan to work for Maryland Casualty Company in Jackson, Mississippi, until I am fired, retired or expired." He sent a blind copy to Bremmerman. Price identified a letter dated June 3, 1969, which he received from Lucas complaining about Price's failure to make a proper weekly report in which Lucas said: "I am sure you will agree that your report leaves much to be desired; and since we (the New Orleans branch) have been criticized, I trust that in the future you give us a more complete report on your activities, stating what is going on in the agency and what you are accomplishing."

Plaintiff called Wayne Campbell as an adverse witness. Campbell had joined Maryland Casualty in 1954. He had served as a casualty officer in Dallas, a casualty underwriter in Kansas City, an assistant resident manager and then manager in San Francisco, where he became surplus and was transferred to Jackson in March 1967 to serve as an underwriting and production manager in the absence of an underwriting service in the Jackson office for casualty insurance, neither Price nor Mansell being qualified as such, both being the only

marketing representatives "A" in the Jackson office. Campbell said that a young man, Hugh Brown, who was a trainee underwriter in the Jackson office, resigned in 1969. Campbell knew he would not be replaced and was instructed to start training Mansell as a casualty underwriter, as Mansell was already trained in property underwriting. He acknowledged that plaintiff underwrote bonds, by premium volume a minor service. He first learned of Price's early retirement in August 1970 via a phone call from Lucas. Campbell said he had nothing to do with the decision but later learned it was made by marketing executives in Baltimore. He acknowledged surprise but said he knew that the volume in Jackson was not what it should be. He stated that the Jackson office in 1970 produced a volume of $2,000,000.00, an increase over 1967, and in keeping with the increase of the national average, but that the total volume was low considering the fact that an underwriter had been added to the Jackson office. Prior thereto, the marketing agents, Price and Mansell, had to secure the underwriting for their sales from the New Orleans office. The added service was to encourage their local agents to increase business for Maryland Casualty. In comparing Price to Mansell, Campbell said Mansell's production became more diversified and he was the more effective of the two. Because of Mansell's underwriting duties, Campbell assigned Mansell's territory to Price. As it was obvious that Price could not service twice as many agents, Price was encouraged to drop the agencies furnishing Maryland a low premium volume and concentrate on those producing a large volume. In 1971 the Jackson office had its only decrease in volume sales. In 1972 and 1973 the volume increased but according to the witness the volume has not yet reached its goal of a 25 per cent increase. In response to the question would he re-hire Price, Campbell responded that it would not be his decision to make, but that he could not justify an addition to personnel.

Lee Mansell, testifying on behalf of Price, said he had worked with Price since 1952, was a good friend, and considered him an efficient and effective marketing representative, one of the best. He said they each produced an equal amount of business. He estimated that the total premium volume handled by the Jackson office grew from over $1,000,000.00 in 1965 to $2,000,000.00 in 1970. It fell below $2,000,000.00 in 1971 but increased again in 1972 and 1973. He admitted that this volume comparatively was below that of New Orleans and Baton Rouge, but felt that the Jackson office had improved upon the acquisition of its own underwriter. In referring to his own salary Mansell stated that he had increases of 4.9% in 1971 over 1970; 6.3% in 1972; 4.6% in 1973, and 8% in 1974.

Several Mississippi insurance agents serviced by Price testified in his behalf, all saying that he was competent and effective. Mr. George S. Turpin, a former employee of a competitor of Maryland Casualty, stated that he had known plaintiff for over 30 years and that Price was highly regarded by the agents he called on. However, Turpin, who at one time supervised eight marketing agents for his company, said that each produced an average of $3,400,000.00 in premium value in 1970, far above that attained by either Price or Mansell with Maryland Casualty.

Plaintiff's last witness was Wilmer H. Howell, a certified public accountant. Using the annual wage increase in percentages Mansell said he received, Howell took Price's salary in 1970 of $10,896.00, and projected that it would have been $11,162.00 in 1971; $11,865.00 in 1972; $12,410.00 in 1973; and $12,823.00 up to 8/1/74. He also offered projections of what Price's salary would be had he continued to work to normal retirement at age of 65 which he would have reached in 1979. The Court considers any such projected salary for years following the trial of this case inapplicable. See Monroe v. Penn-Dixie

Cement Corporation, Ga., 335 F.Supp. 231. Such relief is also beyond that sought by plaintiff in his last amended complaint.

As noted above, plaintiff introduced the depositions of Maryland Casualty officials—those of Charles H. Peterson, president; Paul Penbrook, executive vice-president; Warren J. Kwedar, vice-president of marketing; Robert S. Pyle, director of employee benefits; Lucien L. Lucas, resident vice-president of the New Orleans branch; Warren Zapp, assistant resident manager of the El Paso branch; and George T. Howard, Jr., resident vice-president of the Los Angeles office; and the deposition of the senior vice-president and treasurer of American General, Joe F. Flack.

Flack made it clear in his deposition and the exhibits thereto that American General is the parent or holding company for some 24 companies including three groups, those dealing in life insurance, those dealing in property and liability insurance, including Maryland Casualty, and a third group dealing in financial services. American General services the payrolls of most of these companies, including Maryland Casualty. Maryland Casualty employees receive their pay on checks, on the face of which appears "The American General Group." Their pay, however, is drawn from Maryland Casualty funds. Similarly, under the name of "The American General Group", employees of Maryland are offered retirement benefits, life insurance, medical insurance, disability benefits, thrift plans, travel accident insurance and workmen's compensation, and perhaps other benefits, all dependent on their employee status with Maryland Casualty. There is no evidence throughout this case that American General was the employer, by reason of these group endorsed benefits, of plaintiff Price. His participation in them was by reason of his employment with Maryland Casualty. Price was offered employment by Maryland Casualty through which, as an employee of Maryland Casualty, he could participate in plans and benefits serviced by American General. Plaintiff, for his pendent claim that Maryland Casualty and American General breached his employment contract as well as retirement and other beneficial plans, has tried somehow to say that both defendants by accepting his participation in these plans vested plaintiff with contractual rights. He had no contractual right of employment. True, he may have had a written employment contract with Black Rogers, but he offered no evidence of any guarantee made by American General or Maryland Casualty as to his continued employment for any specified term. As to his vested pension rights, participation in them is not a continuous guarantee of employment. Nor have these rights been terminated. Maryland Casualty concedes that plaintiff's pension benefits remain intact and inviolate awaiting his choice of receiving them now or at a deferred date, a choice that has been offered and so far refused. Plaintiff's cited case, Stopford v. Boonton Moulding Co., 56 N.J. 169, 265 A.2d 657, 46 A.L.R.3rd 444 is inapplicable. In Boonton the terms and conditions of a contributory pension plan were for continuance of employment until the required age and period of service were reached. The employee reached these limits. Having done so, the court found the employer had to abide by the terms it had set. Maryland Casualty's pension plan, in evidence, specifically provides for early retirement based on age and length of service.

On the basis of the evidence in this case, the Court finds that plaintiff has wholly failed in his pendent claim against the defendants for a common law breach of contract, either as joint employers or in a conspiracy.

The remaining and sole issue is directed to whether plaintiff was placed in early retirement in violation of 29 U.S. C. # 623(a), or whether his termination comes within the exceptions of 29 U.S.C. # 623(f)(2) and (3).

These sections are as follows:

"Section 623. *Prohibition of age discrimination—Employer practices.*

(a) It shall be unlawful for an employer—

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . .

(f) It shall not be unlawful for an employer, employment agency, or labor organization—

(2) to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter, except that no such employee benefit plan shall excuse the failure to hire any individual; or

(3) to discharge or otherwise discipline an individual for good cause."

According to Peterson, around February or March 1970, Maryland Casualty, due to its high expense ratio and high loss ratio, determined to reduce its total number of employees by twelve and a half percent over a fourteen month period. Meetings were had in Baltimore of office managers from all branches to determine what paperwork could be eliminated and the calculated risk in so doing. A decision was made to eliminate a substantial amount of clerical help both in Baltimore and in the branches. At the same time the marketing division was asked to review the marketing representatives and the territories covered, and the underwriters. The same review was made in the claims division. Maryland Casualty hoped to accomplish the goal by attrition. The decision for this reduction in staff was wholly made by executives of Maryland Casualty. In aid of this goal Peterson had no idea how many employees were lost to normal attrition and how many were placed on involuntary retirement.

According to Flack, American General knew of the decision only after it was made. These statements were uncontradicted, and the Court finds that plaintiff wholly failed in its burden to establish a conspiracy between Maryland Casualty and American General to place Price on early retirement status.

Turning now to Maryland Casualty's account of the events leading up to Price's termination, the Court has reviewed the depositions of executive officials of Maryland Casualty, placed in evidence by the plaintiff, and the testimony of those who testified, particularly Lucas, resident manager of the New Orleans branch, and Warren Zapp and Warren J. Kwedar, both of whom were marketing officials of Maryland Casualty at the home office and over Lucas as the time the decision was made to terminate Price.

This evidence may be summarized as follows: In the mid-1960's, both the home office and the New Orleans branch became concerned about the small volume of business written by Price and Mansell in their Mississippi territory. In 1967 Quedar, vice-president in charge of marketing, developed a concept known as "super service" offices. As applied to the Jackson office, it meant the addition of personnel qualified to perform casualty underwriting, a service not then offered in Jackson, but which had been recommended by Lucas, the then resident vice-president manager of the New Orleans branch which included the Jackson office. Thus if Maryland Casualty's two marketing representatives in Mississippi were able to secure sophisticated underwriting in Jackson without reference to New Orleans, it was thought that the insurance company could substantially increase its premium volume in Mississippi. It was to this end that Campbell, an experienced underwriter with administrative capabilities, was assigned to Jackson on March 1, 1967. In 1966, Price and Mansell together produced gross written premiums in the sum of $1,310,389.00, an increase over 1964 and 1965, but not commensurate

with that produced in 1966 by one marketing representative in each of the Baton Rouge—Lafayette, Monroe, and Shreveport, Louisiana, markets, totaling $2,954,831.00. In 1967, with Campbell servicing agencies in the City of Jackson for the ten months of that year he was in Jackson, and, with Mansell and Price servicing the rest of the state except the nine northeast counties and three counties on the Gulf Coast, the total volume rose to $1,505,959.00, while the aforesaid Louisiana offices with three marketing representatives serviced a total of $3,446,324.00. In 1968, the Jackson service office produced $1,475,641.00, a sum less than in 1967, but with increased amounts by Campbell and Mansell, the loss being attributable to Price, while the three Louisiana offices outside New Orleans, increased to $3,674,043.00. In 1969, the Jackson office increased to $1,813,591.00, with the largest increase credited to Campbell inside the City of Jackson, with Price again below Mansell. In the same year, although the Louisiana offices outside New Orleans dropped in volume to $3,607,144.00, this territory covered by three marketing representatives was still approximately double that of the Jackson office. In late 1969, as indicated above, Brown, the property underwriter in Jackson, terminated his job and was not replaced. Instead Mansell was relieved of servicing his agents except for two in Meridian and one in Vicksburg, was assigned as the property underwriter in the Jackson office, and Price was re-assigned the remainder of Mansell's agents. As indicated by the above premium volumes, Maryland Casualty's adoption of the super service offices was not successful, at least not in the Jackson office. Coinciding with this development, and due to an increase in loss ratio, Maryland Casualty in 1970 began a critical look at the performance of each of its branch and service offices and did not replace personnel lost through attrition. According to the evidence on behalf of Maryland Casualty, unrelated to its austerity program, Warren Zapp, regional marketing manager at the home office, visited New Orleans in February 1970.[2] Although Zapp's visit was for another purpose, it was timed to coincide with a meeting of all of the marketing representatives attached to the New Orleans branch office, including Price and Mansell from Mississippi. Zapp spent nearly an hour with each, and, with Price, limited the discussion to the agencies serviced by Price before he took over Mansell's agents. Zapp was unable to get satisfactory answers from Price regarding those agencies. Zapp concluded that Price did not know the agencies' potentiality well enough or was not picking up the type of information which the company required in order to market its product effectively. Zapp reported these negative impressions to both Lucas, Price's immediate superior in New Orleans, and to Howard in Baltimore. Five months later, while Lucas was at the home office on routine business, he, at the request of Kwedar, met with Kwedar and Howard to discuss the over staffing at Jackson. It was pointed out that in 1969 Campbell, Mansell and Price produced a premium value of less than $2,000,000.00 although Kwedar, in 1970 was expecting a minimum from each of between $1,500,000.00 and $2,000,000.00. Zapp was called in to the discussion where he repeated his analysis of the relative value of all three men in Jackson and his opinion that Price was the least effective. Kwedar and Howard informed Lucas that the Jackson staff would have to be reduced by one man. As a result of their discussion covering all three men, it was agreed that Price would be terminated. Kwedar wanted Price separated in 30 days. In the light of Price's long period of employment with Maryland Casualty, Lucas

2. At that time Zapp was under the direct supervision of George T. Howard, Jr., then assistant vice-president in the marketing division, and under the ultimate supervision of Warren Kwedar, marketing vice-president. Both Zapp and Kwedar testified.

requested that he be permitted to remain on the job until December 31, 1970, and this request was granted. Lucas gave no consideration to a transfer in view of Price's former requests not to be transferred, and because of his ineffectiveness although in his home territory in Mississippi. As to vacancies then existing in the New Orleans office, Lucas said that Price was not qualified for the vacancies in underwriting, and was over-qualified for trainee positions in marketing or in clerical assistance. Robert G. Seay succeeded T. A. Schmidt in New Orleans in 1967. Both were supervisory employees over Price in the marketing division of the New Orleans branch. Both testified, and, although giving Price and Mansell the same evaluation as marketing representatives up to 1970, both Seay and Schmidt said that Mansell was the more effective of the two, responding better to the more sophisticated types of coverage than did Price, and both gave illustrations of instances in which Price was unresponsive to the needs of agencies and uncommunicative with Maryland Casualty.

After a review of all of the evidence, the Court finds plaintiff's allegations against both defendants, separately and as a conspiracy, unsubstantiated as to the pendent charges of broken promises of employment or breaches of contractual benefits. As to the alleged violations of the Age Discrimination in Employment Act on behalf of the class claimed by plaintiff on up to and during the trial, the Court finds that plaintiff failed to establish such a class. Nor has plaintiff offered any proof that at any time plaintiff's age was a factor in his involuntary early retirement. The only mention of age was by plaintiff himself in his letter to Mr. Logue wherein he claimed his age as a reason for not accepting other employment. Assuming that, by virtue of his termination at age

56, this in and of itself establishes a prima facie case of age discrimination, the Court finds that the response of Maryland Casualty more than rebuts the assumed presumptions. Certainly the Act does not contemplate that private industry may not retrench in times of austerity. The undeniable proof on the part of Maryland Casualty was that this company required a reduction in staff beginning in 1970 due to its increased expenditures and loss ratio. According to its officials, the marketing representatives are the eyes and ears of Maryland Casualty. In large measure its success depends on the effectiveness of its marketing representatives. These men, somewhat on a professional level, are not protected by unions, nor in this case by seniority or length of service. The fact that Price was Maryland Casualty's oldest employee in Mississippi by age and length of service was no guarantee of continued employment. His effectiveness was necessarily measured in terms of the gross premium volume he was able to generate for his company. At a time when his company was compelled to reduce its personnel in Jackson, Price was found to be the most expendable, regardless of his age. See Stringfellow v. Monsanto Co., Ark., 320 F.Supp. 1175; Terrell v. Feldstein Co., Inc., 5 Cir., 468 F.2d 910; Gill v. Union Carbide Corp., Tenn., 368 F.Supp. 364. The Court finds that plaintiff has failed to prove that his involuntary early retirement was in violation of the Act, and therefore finds that his case should be dismissed. As indicated above, Bradwell's alleged cause of action must also be dismissed for his failure to appear at the trial and to offer any evidence on his behalf.

An appropriate order to this effect with costs taxed to the plaintiff may be submitted within the time allowed by the rules of this Court.