**Adam H. DORSCH, Plaintiff-Appellant,**

v.

**L.B. FOSTER COMPANY,**
**Defendant-Appellee.**

No. 84–3157.

United States Court of Appeals,
Seventh Circuit.

Argued June 10, 1985.

Decided Feb. 5, 1986.

Robert E. Arroyo, Keck, Mahin & Cate, Chicago, Ill., for plaintiff-appellant.

Stephen S. Mayer, Grotta, Glassman & Hoffman, Roseland, N.J., for defendant-appellee.

Before COFFEY, EASTERBROOK, Circuit Judges and GRANT, Senior District Judge.*

COFFEY, Circuit Judge.

The plaintiff, Adam Dorsch, appeals the district court's grant of summary judgment in favor of the defendant, L.B. Foster Company, and finding that the plaintiff's involuntary early retirement and the defendant's early retirement plan were not in violation of the Age Discrimination in Employment Act. We affirm.

## I.

The plaintiff, Adam Dorsch, was employed as a pipe salesman in the Chicago regional office of the L.B. Foster Company ("Foster"), a national manufacturer and distributor of pipe, rail and other steel products. During his initial term of employment with Foster, Dorsch worked as an "inside" and "outside" salesman.[1] After leaving Foster for a period of time to assist in the formation of another company, Dorsch returned to Foster in 1972 as a pipe salesman handling both outside and inside sales. Beginning in January of 1983, Dorsch, at the direction of his supervisor, Doug Paschal, devoted 50 percent of his time to administrative duties including purchasing and inventory control for the Mid-West Region of the company, providing pricing assistance to district salesmen, and inspecting inventory at the Region's warehouse. No other salesman was assigned to these administrative functions.

In 1983, Foster, suffering the effects of the general economic downturn, reorganized its operations. As part of the reorganization the Chicago regional office became a district office and its administrative functions were moved to the Atlanta office. Stan Hasselbusch, an employee who had previously worked in the Chicago office, returned from his New York assignment to the Chicago office and was elevated to the position of district manager. After accepting the appointment as Chicago district manager, Hasselbusch discussed the Chicago office with his superior, Dean Frenz, and learned that the company had determined that the company's average gross profit per salesman in the Chicago district had to be $250,000 per sales person. Because the sales in the Chicago office were roughly $900,000, Hasselbusch decided that he would have to discharge several sales department employees. In order that he might have a clear picture of the Chicago operation and to assist in his determination of which salesmen to discharge, Hasselbusch decided to interview the salesmen in the Chicago office and sent all of the salesmen, including Dorsch, the following teletype: "Please arrange your schedules to be in the Chicago District Office on Tuesday, July 5. Dean Frenz and I will be in Chicago and would like to meet with each of you. If you have any conflicts, please advise me." The record fails to reveal when, if ever, Dorsch, who was on vacation at the time, received the teletype. Dorsch, among others, did not attend the meeting and Hasselbusch did not re-notify any of the salesmen that failed to appear. Hasselbusch, however, did interview Doug Paschal, Dorsch's supervisor, and Richard Brabec, Dorsch's former supervisor. From these interviews, Hasselbusch learned that 50 percent of Dorsch's time was devoted to administrative functions, and, as to sales, that Dorsch primarily maintained existing accounts—i.e., he solicited and received orders from established customers. Brabec commented to Hasselbusch that Dorsch "preferred" inside work and in response to the question of what people from the department he would let go, Brabec stated that he would discharge Dorsch and a Joseph Shaffer. Brabec noted that Steve Lochen and Lee Croger opened more new accounts than Dorsch.

---

* The Honorable Robert A. Grant, Senior District Judge of the Northern District of Indiana, is sitting by designation.

1. Although neither the pleadings nor the briefs specifically define these terms, it is apparent from this material that an "outside" salesman travels to and calls on customers at their business location while an "inside" salesman remains at the company headquarters and sells and receives orders over the telephone.

In addition to conducting the interviews, Hasselbusch and Frenz examined net sales and gross profit sales data for the Chicago office salesmen for the years 1981, 1982, and 1983. The reports revealed that Dorsch, who devoted 50 percent of his time to administrative duties in 1983, had experienced a 50 percent decline in his 1983 sales in comparison to his 1982 sales and that the sales of two other pipe salesmen, Steve Lochen and Lee Croger, exceeded Dorsch's sales in 1983.

At the conclusion of his review, Hasselbusch determined that because of the dramatic decline in the sales of the Chicago office, the office was in need of salesmen who could and would develop new customers and markets. Hasselbusch placed Dorsch on involuntary early retirement after the elimination of his administrative duties since he had failed to demonstrate that he had the ability to develop new customers. Dorsch was age 60 at the time of his involuntary retirement. In addition to Dorsch, Hasselbusch terminated Carl Pambianco (age 35), Doug Paschal (age 39) and Joseph Shaffer (age 28). Hasselbusch retained three salesmen, including Lochen (age 38) and Croger (age 31). Brabec voluntarily took an early retirement.

After notifying Dorsch of his termination, Hasselbusch informed Dorsch that he was eligible for early retirement under the company's "Rule of 75" program. The Rule of 75 plan provided $600 per month until age 62 to an employee whose age plus total years of service with Foster was equal to or greater than 75 years. Dorsch rejected the offer and received a lump sum severance payment of $16,500.

Dorsch filed suit in the United States District Court for the Northern District of Illinois alleging that his involuntary retirement violated the ADEA.[2] The defendant moved for summary judgment and the district court found in the defendant's favor holding that Dorsch could not establish a prima facie case because he failed to demonstrate that he was as qualified as the salesmen who were retained. In the alternative, the district court determined that even if Dorsch were able to establish a prima facie case, Foster's reason for placing him on early retirement was not a pretext for discrimination. Dorsch filed a motion to reconsider and also sought leave to amend his complaint to add a count alleging that Foster's early retirement plan violated the ADEA because younger workers received a larger total payment of early retirement benefits than older workers. The district court denied the motion to reconsider, but granted leave to amend the complaint and "construe[d] plaintiff's opposition to the motion for leave to file as an extension and renewal of its previous summary judgment motion," and granted summary judgment in Foster's favor. The district court judge reasoned that the Rule of 75, which provided each employee with the same $600 per month benefit, did not violate the ADEA because:

> "The total sum received by the time one reaches age 62 differs depending on age of retirement but this is due to the inherent discrepancies in amount of years less than 62—a fact of the passage of time, rather than a fact of discrimination. It is obvious, of course, that one retiring at age 60 has received more compensation in salary or wages than one being retired at age 50."

## II.

### A. The Reduction in Force

■ Dorsch contends that the district court erred in granting summary judgment to the defendant on his forced early retirement because he was in fact qualified for another position with Foster as a pipe salesman and, further, that Foster's reason for placing Dorsch on early retirement was pretextual. The ADEA promotes "employment of older persons [ages 40 to 70] based on their ability rather than their age...." 29 U.S.C. § 621. To establish a violation of

---

2. Count II of the Complaint contended that Foster breached an implied covenant of good faith and fair dealing by placing him on involuntary early retirement. Dorsch does not appeal the district court's grant of summary judgment to the defendant on this count of his complaint.

the ADEA, a plaintiff must prove that an adverse employment decision, such as discharge, was made because of his age. *La-Montagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1409 (7th Cir.1984). "To accomplish this, he must prove not that age was the sole factor motivating the employer to discharge him but that age was a 'determining factor,' in the sense that he would not have been discharged 'but for' his employer's motive to discriminate against him because of his age." *Id.* The plaintiff may prove his case with direct or circumstantial evidence. *Id.* When the plaintiff presents indirect evidence, the court adopts the analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) to evaluate the evidence. *Tice v. Lampert Yards, Inc.*, 761 F.2d 1210, 1212 (7th Cir.1985). Initially, the plaintiff must prove a *prima facie* case of age discrimination. *Id.* A plaintiff in a reduction in force case,[3] establishes a *prima facie* case by:

> "(1) ... showing that he is within the protected age group and that he has been adversely affected—discharged or[4] demoted—by defendant's employment decision;
>
> (2) Showing that he was qualified to assume another position at the time of discharge or demotion; and
>
> (3) Producing evidence, circumstantial or direct, from which a fact finder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue."

*Williams v. General Motors Corp.*, 656 F.2d 120, 129 (5th Cir.1981); *Matthews v. Allis-Chalmers*, 769 F.2d 1215, 1221 (7th Cir.1985); *Tice*, 761 F.2d at 1215 n. 5. Suc-

cessfully establishing a *prima facie* case gives rise to a rebuttable presumption of discrimination. *Klein v. Trustees of Indiana University*, 766 F.2d 275, 280 (7th Cir.1985).[5] "If the plaintiff demonstrates a *prima facie* case, the employer has the burden of offering a justifiable nondiscriminatory reason for the termination." *Tice*, 761 F.2d at 1212–13.

> "The defendant's burden in presenting a legitimate, non-discriminatory reason for his action is only a burden of production; the burden of persuasion rests at all times on the plaintiff. Thus, '[i]t is sufficient that the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the [allegedly discriminatory action]. If a defendant carries this burden of production, the presumption raised by the *prima facie* case is rebutted and the factual inquiry proceeds to a new level of specificity.' "

*Klein*, 676 F.2d at 280, *quoting Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254–55, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). If the employer offers a justifiable non-discriminatory reason for its actions, the burden shifts back to the employee to prove that the reason given by the employer was a mere pretext for discrimination. *Tice*, 761 F.2d at 1213.

Dorsch disputes the district court's finding that, "Dorsch cannot establish that he was as well qualified as those employees not discharged," pointing to his 1982 sales figures, a congratulatory "Fostergram" he received in June, 1982, the absence of complaints or criticism concerning his work,

---

**3.** The *prima facie* case element of the *McDonnell Douglas* test is flexible and may be adapted to the fact situation as appropriate. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252 n. 5, 101 S.Ct. 1089, 1093 n. 5, 67 L.Ed.2d 207 (1981).

**4.** In this circuit, the first element is expressed as two elements: "1) showing he was within the protected age group; 2) showing he was adversely affected, either through discharge or de-

motion...." *Matthews*, 769 F.2d at 1221; *see also Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93 (7th Cir.1985).

**5.** *Klein* was a sex discrimination case under Title VII. The framework of proof established in *McDonnell Douglas* is applicable to both Title VII and ADEA cases. *Klein*, 766 F.2d at 282 n. 4.

and his greater experience in selling pipe as evidence of his qualification to assume another position as a pipe salesman for Foster. The meaning given to the term "qualified" depends upon the nature of the employer's business at the time the decision to offer or terminate employment is made. *Kephart v. Institute of Gas Technology,* 630 F.2d 1217, 1219 (7th Cir.1980).

"Qualification obviously depends on the nature of [the] business at any given time. One year an outgoing business-getter type might be best qualified, while in the next, after the business was got, it might be a cloistered scientist or mathematician. To ignore the shifting nature of qualification from time to time would make the qualification requirement meaningless and would encourage the harassment of small businesses having informal personnel practices, with unfounded suits."

*Id.*

In a deposition submitted in support of the defendant's motion for summary judgment, Stan Hasselbusch testified that because the Chicago office sales had declined dramatically, Hasselbusch determined that the company needed salesmen who could reverse that trend by developing new customers. Hasselbusch did not consider Dorsch's high volume of sales in 1982 as indicative of an ability to obtain new accounts because all of Dorsch's 1982 sales came from existing customers rather than new customers. Moreover, after his interviews with the Chicago salesmen, Hasselbusch determined that Dorsch "preferred" inside work and that Lochen and Croger were more successful at developing new business. Indeed, Hasselbusch's own impression of Dorsch, based upon his experience in working with Dorsch before he was transferred to New York, was that Dorsch was "not aggressive" in the sense that, "he didn't appear to be out seeking new customers, new businesses, which I believe is so important." Hasselbusch placed Dorsch on early retirement because he failed to demonstrate an ability to obtain new business.

When a defendant in an employment discrimination case moves for summary judgment, "[t]he plaintiff's rebuttal evidence must focus on the defendant's specific reasons for taking the challenged employment action." *Klein,* 766 F.2d at 282. As summarized above, Hasselbusch placed Dorsch on early retirement because he failed to demonstrate an ability to obtain new business. The district court found, and Dorsch admitted in his deposition, that the responsibility for developing new customers was not removed from his duties until 1983. Dorsch further admitted in his deposition that he failed to develop any new customers in 1980, 1981, or 1982. Thus, Dorsch's own admissions established that he did not bring in a single new customer in the three and one-half years prior to his termination. We have searched the record in vain for an explanation of this failure to develop new business. The evidence on which Dorsch relies (his 1982 sales figures, the "Foster-gram," the absence of criticism or complaints, and his greater experience) is simply irrelevant because it fails to explain why he failed to obtain new business when the development of new business was part of his duties as a salesman. Since the plaintiff failed to present evidence rebutting the defendant's specific reasons for placing him on early retirement, we hold that the district court properly granted summary judgment to the defendant based on the plaintiff's inability to establish a *prima facie* case.

■ The district court found, in the alternative, that even if the plaintiff had been able to establish that he was qualified, he was unable to establish that the employer's reason for placing him on early retirement was a pretext for discrimination. Dorsch argues that Hasselbusch's decision to terminate him, "was so unfounded as to raise an inference that it is a pretext." In Dorsch's view, a question of credibility was raised because, "[a]t issue is whether Hasselbusch was told that Dorsch was less capable of attracting new business and, if he was so told, whether Hasselbusch believed it to be true or used the advice as a pretext for age discrimination

knowing that the advice was erroneous." As evidence of the "unfounded" nature of Hasselbusch's decision, Dorsch contends that Hasselbusch did not undertake a review of the accounts developed by the pipe department salesmen but only reviewed net sales and gross profit summaries. Moreover, Dorsch points to Brabec's deposition testimony that Brabec told Hasselbusch that Dorsch had expressed a "preference" for inside sales as contradicting Hasselbusch's deposition testimony that he had been told that Dorsch was "unwilling" to solicit new customers. Dorsch further claims that Hasselbusch ignored Doug Paschal's evaluation of Dorsch, given in Paschal's interview with Hasselbusch, that Dorsch was capable of performing inside and outside sales. Dorsch further argues that he was the only salesman in the pipe department who was not interviewed and that Hasselbusch relied on his vague impression that Dorsch was "not aggressive." Finally, Dorsch contends that the $250,000 guideline given Hasselbusch meant that salesmen whose company gross profits were greater than $250,000 were to be retained. Dorsch argues that because his gross profit was greater than $250,000, his termination was in contravention of the guideline.

Initially we reject the plaintiff's attempt to raise a credibility issue by framing the issue as, "whether Hasselbusch was told that Dorsch was less capable of attracting new business and if he was so told, whether Hasselbusch believed it to be true or used the advice as a pretext for age discrimination knowing that the advice was erroneous." It is not the court's duty to determine the validity of the defendant's business decision as long as the decision was made in good faith. *Tice,* 761 F.2d at 1215 n. 6. An evaluation is made in good faith if it was genuinely and honestly made in an attempt to select the employees to be retained on the basis of performance related considerations. *See, e.g., Smith v. Flax,* 618 F.2d 1062, 1067 (4th Cir.1980); *Mastie v. Great Lakes Steel Corp.,* 424 F.Supp. 1299, 1316 (E.D.Mich.1976); *Price v. Maryland Cas. Co.,* 391 F.Supp. 613, 625 (S.D. Miss.1975); *Gill v. Union Carbide Corp.,*

368 F.Supp. 364, 368 (E.D.Tenn.1973). Hasselbusch's objective (retaining employees with a demonstrated ability to develop new business) was clearly a performance related consideration. Moreover, Hasselbusch, who had worked with Dorsch in the past, interviewed his present and former supervisors to determine Dorsch's capability to generate and obtain new business. On the basis of this record, we agree with the district court's decision that Foster's reason for placing Dorsch on early retirement was not a pretext because Hasselbusch, in exercising his business judgment, evaluated Dorsch in good faith. Furthermore, an examination of Dorsch's proffered arguments in opposition reveals that Dorsch's attempts to attack the sufficiency of the evaluation, engages in meaningless semantic squabbles and, at best, misstates the record. In particular, the argument that Hasselbusch should have "review[ed] the accounts developed by the pipe department salesmen before placing Dorsch on early retirement" or given more weight to the opinion of Paschal, the terminated supervisor, is an attempt to override Hasselbusch's judgment; during his interviews with the Chicago salesmen Hasselbusch determined that Dorsch was not developing new business. Hasselbusch decided that it was not necessary to extensively question Paschal about Dorsch's ability because he had sufficient information from the interviews, the sales report, and his own work experience on which to base his judgment. Moreover, Hasselbusch felt that Paschal "was part of the old regime" and "was on the way out." The quarrel over whether Dorsch was "unwilling" to solicit new customers or "preferred" inside sales to outside sales is not material because, whatever his motivation, Dorsch failed to develop any new business in the three and one-half year period before his termination even though the development of new business was part of his duties. Moreover, because Dorsch failed to point to specific evidence in the record contradicting Hasselbusch's testimony that three other salesmen were interviewed, he fails to create an issue of fact precluding a grant of summary judgment. *McDonnell v. Flaharty,* 636 F.2d

184 (7th Cir.1980). Similarly, Dorsch misconstrues the $250,000 gross profit guidelines; Hasselbusch testified that the guideline was used to determine staffing levels rather than which salesmen were to be terminated. Finally, Hasselbusch's observation of Dorsch's passivity directly referred to his ability, interest or motivation to generate new business. A subjective qualification assessment does not convert an otherwise legitimate reason into an illegitimate one. *EEOC v. Western Electric Co.,* 713 F.2d 1011, 1016 (4th Cir.1983); *Reilly v. Califano,* 537 F.Supp. 349 (N.D. Ill.), *aff'd,* 673 F.2d 1333 (7th Cir.1981). In sum, Dorsch has failed to demonstrate that Hasselbusch's business judgment in terminating his employment either did not attempt to select employees on the basis of performance related considerations or was not genuinely and honestly made. We hold that the district court properly determined that the plaintiff failed to demonstrate that the employer's business judgment was a pretext.[6]

*B. Rule of 75*

■ Under Foster's "Rule of 75" early retirement plan, employees whose age plus total years of service with Foster was equal to or greater than 75 years were eligible to receive $600 a month retirement pay until age 62. Dorsch reasons that the plan violates the ADEA because younger workers, who receive the $600 monthly payment for a greater number of years, receive greater total benefits. Foster argues that it did not discriminate because all qualified employees receive the same monthly payment of $600. Foster does not

argue that the Rule of 75 is a bona fide employee benefit plan under 29 U.S.C. § 623(f)(2).

"[A] benefit that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion even if the employer would be free ... not to provide the benefit at all." *Transworld Airlines, Inc. v. Thurston,* —— U.S. ——, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985). Indeed, a company plan that denies severance benefits because of the employee's age violates the ADEA. *EEOC v. Borden's Inc.,* 724 F.2d 1390 (9th Cir.1984); *EEOC v. Westinghouse Electric Corp.,* 725 F.2d 211 (3rd Cir.1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 92, 83 L.Ed.2d 38 (1984). Foster, however, did not *deny* benefits to employees based on their age; to the contrary, Foster's plan, which selected employees on the basis of both age and years of service, showed a preference for older workers in determining which employees were eligible to receive benefits. Furthermore, all eligible employees (i.e., those whose age plus years of service with Foster was equal to or greater than 75 years) received equal monthly benefits. When questioned at oral argument before this Court, the plaintiff was unable to articulate a reason supporting his belief that the ADEA mandates that the employees receive equal total early retirement benefits rather than equal monthly early retirement benefits.

Because the plaintiff argues that the Rule of 75, which showed a preference for older workers in determining which employees were eligible to receive benefits, had an adverse impact (lower total benefits) on older workers, he seems to attempt

6. In addition to attacking the adequacy of Hasselbusch's investigation, Dorsch attempted to establish that the reason for placing him on early retirement was pretextual by introducing statistics purporting to demonstrate that the average age of the 95 pipe and rail salesmen employed by Foster nationally was 35 before the reorganization and that as of April 18, 1984, eight months after the reorganization, the average age of the national sales force of 75 salesmen was 34. The district court found, and we agree, that this decrease of one year was not significant. *See Kephart,* 630 F.2d at 1224.

"These statistics, while of some aid in showing discriminatory intent, are not significant in

age discrimination cases unless the disparities in treatment are quite large. The reason such evidence is of little value in assessing discriminatory intent was explained by the court in *Laugesen v. Anaconda Co.,* 510 F.2d [307], 313 [(6th Cir.1975)] 'it is apparent that in the usual case, absent any discriminatory intent, discharged employees will more often than not be replaced by those younger than they, for older employees are constantly moving out of the labor market, while younger ones move in.'"

*Id.*

to establish a disparate impact claim. *Bordens,* 724 F.2d at 1394–95. The adverse impact analysis developed in Title VII cases cannot be extended easily to age cases. *Cunningham v. Central Beverage, Inc.,* 486 F.Supp. 59, 62–63 (N.D.Tex.1980).

"The progression of age is a universal human process. In the very nature of the problem, it is apparent that in the usual case, absent any discriminatory intent, discharged employees will more often than not be replaced by those younger than they, for older employees are constantly moving out of the labor market, while younger ones move in. This factor of progression and replacement is not necessarily involved in cases involving the immutable characteristics of race, sex and national origin."

*Laugesen v. Anaconda Co.,* 510 F.2d 307, 313 (6th Cir.1975).

In *Patterson v. Independent School Dist. ¶ 709,* 742 F.2d 465 (8th Cir.1984), the Eighth Circuit examined an early retirement plan offering a higher early retirement bonus to younger workers under Sec. 623(f)(2), the bona fide employee benefit plan exemption. Under the plan, Minnesota teachers who retired at 55 received a $10,000 bonus; the bonus "diminished by $500 for each year over 55 until 60, and by $1,500 for each year over 60." *Id.* at 468. After determining that the early retirement plan was exempted under Sec. 623(f)(2), the court held that the fact that younger workers received higher bonuses did not violate the ADEA:

"The plan therefore being intrinsically valid, is not vitiated by the fact that by reason of the chronological sequence of events plaintiff could not take advantage of all of its ramifications.

\* \* \* \* \* \*

Obviously a man of 67 cannot retire at 55 and obtain benefits provided for persons of that age. And to effect the purpose of encouraging early retirement, the sliding scale of diminishing benefits is manifestly appropriate."

*Id.* at 468–69.

Because Foster does not argue its Rule of 75 plan is a bona fide employee benefit plan under Sec. 623(f)(2), we must determine whether its decision to provide equal monthly early retirement benefits rather than equal total early retirement benefits violated the ADEA. The purpose of the ADEA is "to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U.S.C. § 621(b). Congress did not intend the Act to be applied formalistically. *Laugesen,* 510 F.2d at 312–13 n. 4.

"The case by case basis should serve as the underlying rule in the administration of the legislation. Too many different types of situations in employment occur for the strict application of general prohibitions and provisions."

*Id.* (*quoting* 1967 U.S.Code Cong. & Adm. News, at 2219–20.) A specific problem the ADEA was enacted to solve was the difficulty older workers experienced in obtaining new employment after termination from their present job. Sec. 621(a)(1) ("In the face of rising productivity and affluence, older workers find themselves disadvantaged in their efforts to retain employment, and especially to regain employment when displaced from jobs.").

"In economic terms alone, unemployment hits the older worker harder than the younger worker because, with the much longer typical duration of his unemployment period, he is more apt to run out of employment insurance benefits. Of unemployed workers age 55 to 64, almost one-fifth were still unemployed after the traditional unemployment insurance maximum span of 26 weeks, as were one-sixth in the 45–54 group. But in the 16–24 unemployed group, only one-twenty-sixth were unemployed after 26 weeks."

Larson, Employment Discrimination, Sec. 98.20 at 21–8 (1984) (Discussing the nature of the age discrimination problem and quoting U.S. Dept. of Labor, Bureau of Labor

Statistics, 21(1) Employment and Earnings 21–22 (July 1974)).

With the Act's purpose in mind, we evaluate the employer's decision to pay equal monthly early retirement benefits rather than equal total early retirement benefits to determine whether the employer violated the Act. Immediately we note that paying equal monthly benefits serves one of the remedial purposes of the Act—providing financial support to unemployed workers and their dependent families. *C.F. Desris v. City of Kenosha, Wis.*, 687 F.2d 1117, 1121 (7th Cir.1982). Thus, a younger worker who is unable to obtain new work and whose unemployment benefits expired would not be without financial resources. Since the decision to provide equal monthly early retirement benefits serves one of the remedial purposes of the Act, we hold that the employer's decision to pay equal monthly early retirement benefits rather than equal total early retirement benefits does not violate the ADEA.

The decision of the district court granting summary judgment on both counts is AFFIRMED.