**Kalim KHAN, Robert Makowski, John Nape, Frank Soesman and Calvin Vernon, individually and on behalf of all those similarly situated, Plaintiffs,**

v.

**GROTNES METALFORMING SYSTEMS, INC., Grotnes Metalforming Systems, Inc. Pension Plan, John G. Mack, Jr. and Christian H. Stettler, Defendants.**

**No. 84 C 7165.**

United States District Court,
N.D. Illinois, E.D.

Jan. 27, 1988.

Michael M. Mulder, Lei Ann Marshall–Cohen, Meites & Frackman, Thomas R. Meites, Chicago, Ill., for plaintiffs.

Lee T. Polk, Arthur B. Smith, Jr., David B. Ritter, Murphy, Smith & Polk, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge:

Plaintiffs filed this employment discrimination suit against defendants on August 17, 1984. Plaintiffs' complaint contains four counts. Count I alleges that defendants discriminated against plaintiffs on the basis of age in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. 621 *et seq.* (hereinafter "ADEA"). Count II alleges that defendants discriminated against plaintiffs on the basis of national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.*, as amended (hereinafter "Title VII"). Finally, plaintiff Makowski claims in Counts III and IV that defendants violated his rights under the ADEA and the Employee Retirement Income Security Act of 1974, 29 U.S.C. 1001 *et seq.* (hereinafter "ERISA"), respectively, in the way they calculated his pension benefits.

Pending before this court are two motions. Plaintiffs seek to substitute the Estate of John G. Mack, Jr. with Catherine Mack as executrix, for John G. Mack, Jr. as a defendant in this action. Plaintiffs base this motion on Fed.R.Civ.P. 25(a). Defendants request the court to grant a summary judgment as to all four counts of the complaint. For the reasons set out below, plaintiffs' motion to substitute parties is granted. Defendants' motion for summary judgment is granted as to Counts II, III, and IV and denied as to Count I.

## BACKGROUND FACTS

### A. The Defendants

Grotnes Manufacturing Systems, Inc. ("Grotnes") manufactures metalforming equipment for sale to manufacturers in the United States and abroad. At the time of the terminations, the company was organized into seven divisions: Engineering, Sales, Accounting, Manufacturing, Data Processing, Personnel, and the Executive Offices.

Defendant John G. Mack, Jr., defendant Heinz Stettler and a corporation, Carl Marks & Co., Inc., which is not a party to this lawsuit, held equity interests in Grotnes at the time it was incorporated on September 30, 1980. Mr. Mack served as Grotnes' Chairman and Chief Executive Of-

ficer from the date of incorporation. Mr. Stettler served as President of Grotnes from the date of incorporation until he retired on April 30, 1985.

Beginning in September, 1982 Grotnes experienced financial decline. Grotnes' first financial loss occurred in the first quarter of 1983; these losses continued through the second quarter of 1983. Sales declined steadily from mid–1982 to mid–1983. Similarly, the backlog of orders declined from mid–1981 through the date of plaintiffs' termination. Then, in early 1983 Grotnes failed to obtain three separate orders from Ford Motor Company for rim-forming and rim-welding equipment totaling more than $10 million in sales.

As a result of these developments, Grotnes' management began to implement cost cutting measures, including freezing salaries, curtailing fringe benefits, and terminating the company pension plan. Eventually, the business downturn forced Grotnes to reduce the salaried workforce. Thus, on March 25, 1983 Mack and Stettler terminated eighteen employees effective March 31, 1983. Of these eighteen employees, fifteen were between 40 and 70 years of age, and none were of Swiss origin.

## B. The Plaintiffs

Each plaintiff is a former salaried employee of Grotnes, and claims that his termination resulted from Grotnes discriminating against him on the basis of age and national origin.

Grotnes hired plaintiff Kalim Kahn as a draftsman on March 22, 1965. During his tenure at Grotnes, Kahn (who was 41 when terminated) received five promotions. Kahn's last promotion in June, 1979 was to the position of Associate Project Engineer in Grotnes' engineering department. Kahn, during his tenure with Grotnes, received 23 raises. After Mr. Kahn's termination, two employees, Georg Zweifel (27 years old) and Andrew Chapman (24 years old), remained in the engineering department in positions which Kahn had held prior to his promotion to Associate Project Engineer.

Kahn did not have an unblemished personnel record. Kahn received a written warning from his supervisor, Alex Weisheit, for sending a "death wish" note and other harrassing messages to Diane Arnold, a secretary in the engineering department. Moreover Kahn had a history of confrontations with his co-plaintiff Calvin Vernon. These resulted in written complaints.

Grotnes hired plaintiff Calvin Vernon as an accounts payable clerk in October, 1969. By the time of his termination from Grotnes, Vernon (then 56 years old) had been promoted to the position of Supervisor, Accounts Payable and Sales Tax in Grotnes' accounting department. During the 13 years Vernon worked at Grotnes, he had received seventeen pay increases.

Vernon also had some difficulties with fellow employees over the years he worked for Grotnes. In addition to his altercations with Kahn mentioned above, Vernon was involved in an incident with a fellow employee over a parking space. Vernon notes that this incident occurred more than ten years before Vernon's termination.

Plaintiff Frank Soesman began work with Grotnes in May, 1971 as a general accountant. During his eleven years of service for Grotnes, Soesman received two promotions and seventeen salary increases. At the time of his termination, Soesman (who was then 46 years old) held the position of Accountant Analyst—Cost and General Accounting.

Soesman, like Vernon and Kahn, was involved in an incident with a fellow employee over the correct way to perform certain accounting functions. Although Soesman testified in his deposition that this argument nearly led to "physical confrontation," Soesman was not issued a written warning.

Plaintiff Robert Makowski was hired by Grotnes as a material handler in July 1950. In October, 1962 Makowski moved into management as a machine shop foreman. At the time of his termination in 1983, Makowski (then 50 years old) held the position of Foreman–Equipment and Assembly. After Grotnes terminated Makowski,

George Koester (then 40 years old) and then Timothy McCarthy (then 34 years old) assumed the position of Foreman for both machine shop and assembly. The evidence reveals that Makowski's supervisor did not believe Makowski's work performance warranted his termination.

Plaintiff John Nape (who was 53 years old when terminated) was hired by Grotnes as a production controller in February, 1969. He remained in that position until he was terminated in 1983. During this time, Nape received eighteen different salary increases. Upon Nape's termination, Dennis Jans (then 34 years old) approached Nape and said that Nape's duties would be his, Jans', responsibility. The evidence shows that Mack believed that Nape was "a good conscientious worker" who "generated a lot of data and a lot of detail." (Mack Dep. at 23.)

At the time of the plaintiffs' terminations, Grotnes had six Swiss employees on the salaried payroll. One of these employees worked in the Executive Offices (where no plaintiff had worked), one worked in Sales (where no plaintiff had worked), and four worked in Engineering (where Kahn had worked). None of these Swiss employees were discharged when Grotnes reduced its workforce on March 31, 1983.

C. The Pension Plan

Grotnes' Pension Plan (the "Plan") is an employee benefit plan within the meaning of Section 3(3) of ERISA, 29 U.S.C. § 1002(3), and thus is governed by the provisions of ERISA (Mack Aff. ¶ 9). The Plan covers salaried employees, and has complied with the requirements of Section 401(a) of the Internal Revenue Code since its establishment.

One provision of the Plan provides an enhanced pension to individuals who have thirty years of credited service to Grotnes. Such eligible employees could receive this 30-year retirement benefit at any age without an actuarial reduction for early commencement of monthly payments. The "30 years" plan provides a lump sum "special payment" for the first three months after termination which is calculated according to the employees' vacation pay entitlement. After this first three months, the employee receives the regular pension payment for life. At age sixty-five, the pension amount is recalculated under a different formula and the employee receives any higher monthly payment which results.

The events which occurred after plaintiff Makowski's termination from Grotnes, taken in the light most favorable to the plaintiff, indicate that shortly after his termination Makowski received a letter from Larry Hamilton, the Grotnes' Manager of Personnel and Safety. This letter outlined Makowski's termination benefits. In addition to giving Makowski this letter, Hamilton assured Makowski (1) that Makowski would receive his severance pay; (2) that Grotnes would continue to pay premiums on Makowski's medical and life insurance for a period of six months; and (3) that these provisions would not affect Makowski's retirement.

Because Grotnes credited Makowski with thirty-two years of service upon his termination, Makowski was eligible for the 30-year enhanced retirement plan. Therefore, on May 20, 1983 Hamilton informed Makowski that Makowski would have to apply for his retirement immediately. On June 1, 1983 Hamilton told Makowski that the severance pay he received upon his termination would be deducted from his pension benefits pursuant to the terms of the Plan. On that date, Makowski signed a card authorizing Grotnes to deduct his insurance premiums from his benefits each month. As a result of these deductions, Makowski's regular pension did not begin until February, 1984.

In the fall of 1983, Makowski invoked the Plan's grievance procedure, claiming that the Plan Committee (consisting of Mack and Stettler) violated the terms of the Plan and their fiduciary obligations by deducting these amounts from his pension benefits. The Plan Committee denied Makowski's claim, stating that the Plan authorized the deductions. The Committee also advised Makowski that he could terminate the deduction for the insurance premiums if he so

desired. In January, 1984 Makowski requested the Committee to review their decision once again, and the Committee affirmed its earlier denial.

## MOTION TO SUBSTITUTE PARTIES

█ Plaintiffs by this motion seek an order to substitute the Estate of John G. Mack, Jr., with Catherine Mack as executrix, for John G. Mack, Jr. as defendant in this cause of action. Plaintiff makes this motion pursuant to Fed.R.Civ.P. 25(a)(1), which provides that a court may substitute a representative of an original party's estate "[i]f a party dies and the claim is not thereby extinguished."

It is well settled in this and other jurisdictions that whether or not an action survives the death of a party is determined as a matter of federal, not state, law. *Smith v. No. 2 Galesburg Crown Finance Corporation*, 615 F.2d 407 (7th Cir.1980); *Asklar v. Honeywell, Inc.*, 95 F.R.D. 419 (D.Conn. 1982); *Coleman v. Kroger Co.*, 399 F.Supp. 724 (D.C.Va.1975); *Porter v. Household Finance Corp. of Columbus*, 385 F.Supp. 336 (D.C.Ohio 1974); *McManus v. Lykes Bros. S.S. Co.*, 275 F.Supp. 361 (D.C. La. 1967). As the Seventh Circuit noted in *Smith*, 615 F.2d at 413, "the question of survival of a federal statutory cause of action is one of federal common law, in the absence of a specific federal statutory directive.... For this reason state survival rules have no application."

Contrary to defendants' assertions, the state law principles which govern survival of federal civil rights actions under 42 U.S. C. § 1983 are not applicable here. 42 U.S. C. § 1988 directs federal courts to refer to state law in deciding all matters which Section 1983 does not specifically address. Consequently, pursuant to federal statute, survival of federal civil rights actions is a matter of state law. *See e.g., Robertson v. Wegmann*, 436 U.S. 584, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978); *Smith*, 615 F.2d at 413–14. The federal statutes upon which plaintiffs based their claims in this case, however, do not contain a provision similar to 42 U.S.C. § 1988. Therefore, the court must look to the federal common law.

Federal common law has long recognized that actions which are penal in nature do not survive the death of a party. *Huntington v. Attrill*, 146 U.S. 657, 13 S.Ct. 224, 36 L.Ed. 1123 (1892); *Asklar v. Honeywell, Inc.*, 95 F.R.D. at 423; *Continental Assurance Co. v. American Bankshares Corporation*, 483 F.Supp. 175, 178 (E.D.Wis. 1980); *Derdiarian v. Futterman Corp.*, 223 F.Supp. 265, 267 (S.D.N.Y.1963); *Dolgow v. Anderson*, 45 F.R.D. 470, 471 (E.D. N.Y.1968). A remedial statute is generally one which redresses individual wrongs and under which recovery runs directly to the individual. *Smith*, 615 F.2d at 414. *See also Asklar v. Honeywell, Inc.*, 95 F.R.D. at 423; *Murphy v. Household Finance Corp.*, 560 F.2d 206 (6th Cir.1977).

█ In this case, plaintiffs based their complaint upon three statutes, each of which is remedial in nature. The ADEA and Title VII "share the common purpose of eliminating discrimination in the workplace." *Cleary v. United States Lines, Inc.*, 555 F.Supp. 1251, 1261 (D.N.J.1983). *See also Asklar v. Honeywell, Inc.*, 95 F.R.D. at 423; *Grant v. Gannett Co., Inc.*, 538 F.Supp. 686, 689 (D.Del.1982). In *Asklar v. Honeywell, Inc.*, 95 F.R.D. at 423, the court stated that "[w]hile the ADEA does provide for liquidated damages, ... its primary purpose is to compensate, and where appropriate reinstate, individuals who have suffered employment discrimination because of their advanced age." Thus, an action under the ADEA is not penal in nature, and survives the death of the defendant.

Similarly, it is beyond dispute that Congress intended Title VII to remedy the wrongs suffered by the victims of employment discrimination. The Supreme Court has stated that the basic purpose of Title VII relief is to "make whole" victims of unlawful employment discrimination. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). Consequently, plaintiffs' Title VII claim survived the death of the defendant Mack.

Finally, Congress intended ERISA to be remedial legislation. The primary purpose

of the statute is to protect participants in employee benefit plans from losing anticipated benefits because their selected representatives mismanage the assets which fund their benefit programs. *Duchow v. New York State Teamsters Conference Pension and Retirement Fund*, 691 F.2d 74, 78 (2d Cir.1982). *See also Smith v. CMTA–IAM Pension Trust*, 746 F.2d 587, 589 (9th Cir.1984) ("ERISA, like the Civil Rights Act of 1871 and 1964 ... is remedial legislation which should be liberally construed in favor of protecting participants in employee benefit plans.") Thus, plaintiffs' ERISA claim also survived the death of defendant Mack.

Because each of the federal statutes upon which plaintiffs base their complaint survive the death of a party, plaintiffs' claim does not abate. This court therefore grants plaintiffs' motion to substitute the Estate of deceased John G. Mack, Jr., with Catherine Mack as executrix, for John G. Mack, Jr. as a defendant in this action.

## MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is appropriate only if the parties' evidentiary materials show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). This court must construe all allegations and inferences in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). To create a question of fact a party responding to a properly supported summary judgment motion must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. at 2510. As the Court stated in *Anderson*, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511. The Court further noted that "the judge must ask himself not whether he thinks the evidence favors one side or the

other, but whether a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

### A. Count One

In Count I of their complaint, plaintiffs allege that in determining which of Grotnes' salaried employees would be terminated in March of 1983, defendants impermissibly considered the age of their employees, thereby violating the ADEA.

#### 1. *Disparate Treatment*

■ To succeed in this age discrimination suit under a disparate treatment theory, plaintiffs have the burden of proving that age was a determining factor in their termination. *Parker v. Federal National Mortgage Association*, 741 F.2d 975, 978 (7th Cir.1984). In other words, plaintiffs must show that "but for" defendants' motive to discriminate against them because of their age, defendants would not have terminated them. *La Montagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1409 (7th Cir.1984).

■ To show that age was a determining factor, plaintiffs can either present direct evidence showing the unlawful discrimination or they can indirectly prove the discrimination by setting forth a prima facie case. *La Montagne*, 750 F.2d at 1409. This court finds that plaintiffs have adduced sufficient evidence to defeat defendants' motion for summary judgment.

##### a. *Direct Method of Proof*

■ Plaintiffs' direct evidence of discrimination raises a fact question as to whether Grotnes discriminated against plaintiffs because of their age. First, plaintiffs claim that Mack demonstrated age animus when he commented that the company would be less vital if it based the terminations only upon seniority rather than upon the employees' work performance.[1] In at least two cases, the Seventh

---

1. Mack commented that "if you always just lay off the younger people, you end up with an

organization like Grotnes was then, which is basically just an older organization with a few

Circuit has found that such statements indicate discriminatory animus in reduction in workforce cases. *See e.g., Coston v. Plitt Theatres, Inc.,* 831 F.2d 1321, 1326 (7th Cir.1987) (the court found an employer's remark that the company "had to go along with youth" to be "the clinching evidence" of defendants' discriminatory intent); *Stumph v. Thomas & Skinner, Inc.,* 770 F.2d 93, 97 (7th Cir.1985) (the company president stated that the company wished to eliminate its older employees). *See also McNeil v. Economics Laboratory, Inc.,* 800 F.2d 111, 115 n. 3 (7th Cir.1986) (the company president stated an interest in hiring new people in order to eliminate "dependence on over-paid and under-motivated veterans of 10 or 15 or 20 years....").

Even more importantly, however, plaintiffs' evidence indicates that Mack wrote down the ages and length of service of four employees when choosing which of five employees to terminate. (Mack Dep. at 63; Mack Dep. Ex. 1.) For example, next to Vernon's name on the list, Mack admittedly wrote "57–14." (Mack Dep. Ex. 1.) When Grotnes terminated him, Vernon was 56 years old and had been with Grotnes for 13 years. (Stettler Dep. Ex. A.)[2] This court believes that a reasonable jury might infer from this evidence that Mack and Stettler considered age when choosing which employees to terminate during the workforce reduction.[3]

Defendant does not refute plaintiffs' evidence. Consequently, the court finds that this evidence creates a genuine issue of material fact with regard to Grotnes' motivation for discharging the plaintiffs. Accordingly, this evidence is sufficient to enable plaintiff to survive defendants' motion for summary judgment.

### b. *Indirect Method of Proof*

Plaintiffs have also produced enough evidence to survive summary judgment under an indirect method of proof. Plaintiffs establish a prima facie case in a reduction-in-force action under the ADEA by showing:

1. that they were within the protected age group;

2. that they were terminated;

3. that they were qualified to assume another position at the time of their termination; and

4. some evidence from which the factfinder can conclude that defendant intended to discriminate.

*Ayala v. Mayfair Molded Products,* 831 F.2d 1314, 1318–19 (7th Cir.1987); *Coston v. Plitt Theatres, Inc.,* 831 F.2d at 1324; *Bechold v. IGW Systems, Inc.,* 817 F.2d 1282, 1284 (7th Cir.1987); *Dorsch v. L.B. Foster Co.,* 782 F.2d 1421, 1424 (7th Cir. 1986); *Matthews v. Allis–Chalmers,* 769 F.2d 1215, 1217 (7th Cir.1985).

After the plaintiffs successfully set forth their prima facie case, the burden then shifts to the employer to articulate some legitimate, non-discriminatory reason for its action. *Ayala v. Mayfair Molded Products Corp.,* 831 F.2d at 1319. The plaintiffs may then show that the employer's stated reasons were in fact pretextual; that the real reason for the employer's action was discriminatory. *Matthews v. Allis–Chalmers,* 769 F.2d at 1217; *La Montagne v. American Convenience Products, Inc.,* 750 F.2d at 1409. It is important to note that "the ultimate burden of proof remains at all times with the

young clerks and no succession to keep the company going long term." (Mack Dep. at 71.)

**2.** Likewise, next to Soesman's name on the list, Mack wrote "47–12." (Mack Dep. Ex. 1.) When Grotnes terminated him, Soesman was 46 years old and had been with the company for 11 years. (Stettler Dep. Ex. A.) The other employees on the list are not plaintiffs in this lawsuit.

**3.** Plaintiffs also assert that few months after plaintiffs' termination, Alex Weisheit, who was Director of Engineering at the time, failed to hire a candidate for senior design engineer because of his age. Plaintiffs supported their claim by noting that during an interview, Weisheit noted in his interview summary that the candidate "is older (57), Polish and speaks very broken English." (Weisheit Dep. Ex. 13.) However, looking at the interview summary as a whole, it is clear that the candidate was unqualified for the position. The remainder of the interview summary stated: "Has no experience in roll formers, expanders, or shrinker design. Interviewed 7/2/84. Told him about lack of experience in our field but left it open for a final comparison with others." This incident does not indicate discrimination.

plaintiff." *Huhn v. Koehring Co.*, 718 F.2d 239, 242 (7th Cir.1983).

In this case, the general reasons which defendants have articulated, when viewed as they must be in the light most favorable to the plaintiffs, are insufficient to rebut an inference of discrimination. Moreover, plaintiffs have produced enough evidence from which a jury might infer that the specific reasons defendants set forth for their actions were pretextual.

Defendants maintain that business necessity mandated the plaintiffs' termination. Specifically, defendants rely on Grotnes' severe financial distress, its need for computerized engineering and accounting systems, and its failure to obtain a critical sales order from Ford Motor Company to justify the reduction in workforce. Moreover, defendants assert that they retained those employees which "best met the qualifications demanded by the future" (Defendants' Brief in Support of the Motion for Summary Judgment at 46), without regard to the age of any particular employee.

Plaintiffs do not dispute that Grotnes faced severe financial difficulties which forced them to reduce the workforce. However, plaintiffs argue that these factors are irrelevant to the issue of age discrimination. Plaintiffs claim defendants discriminated not by reducing the workforce but by deciding which particular employees to discharge by looking at the Grotnes salaried workforce "through eyes improperly focused on the age of each employee." (Plaintiffs' Brief in Opposition to the Motion for Summary Judgment at 47.)

This court agrees that the general reasons which defendants have articulated to legitimate the reduction in workforce are unresponsive to the ultimate issues in this case. The fact that Grotnes was in poor financial health does not rebut plaintiffs' claim that Mack and Stettler used age as a determining factor in choosing which employees to terminate.

Defendants cite one case to support their assertion that a general business decline and workforce reduction suffice to meet defendants' burden of articulating a legitimate, nondiscriminatory reason for plaintiffs' discharge. *See Dorsch v. L.B. Foster Co.*, 782 F.2d 1421 (7th Cir.1986). However, in *Dorsch*, the defendant dismissed plaintiff during a workforce reduction because he had "failed to demonstrate that he had the ability to develop new customers," a function that defendant deemed necessary in a period of economic recession. *Dorsch*, 782 F.2d at 1423.

Moreover, in recent Seventh Circuit reduction in workforce cases employers have articulated specific reasons for terminating each individual employee in addition to general business reasons for initiating the workforce reduction. *See e.g., Bechold v. IGW Systems, Inc.*, 817 F.2d 1282, 1284 (7th Cir.1987) (defendant eliminated plaintiff's function entirely and believed that plaintiff was unqualified to assume another position with the company); *McNeil v. Economics Laboratory, Inc.*, 800 F.2d at 113 (friction between plaintiff and his co-workers). *See also Tice v. Lampert Yards, Inc.*, 761 F.2d 1210, 1215 (7th Cir.1985) (defendant shut down the entire facility operated by plaintiff); *Matthews v. Allis-Chalmers, Inc.*, 769 F.2d at 1217–18 (objective documented criteria ranked plaintiff's work performance lowest among his peers). *Accord Christie v. Foremost Ins. Co.*, 785 F.2d 584, 586 (7th Cir.1986); *Parker v. Federal National Mortgage Association*, 741 F.2d at 977.

Consequently, defendants' general business reasons are insufficient to rebut an inference of age discrimination. Defendants must offer more specific reasons for terminating each individual plaintiff in order to rebut each plaintiff's prima facie case.

Moreover, this court believes that a reasonable jury might infer from statistical evidence that Grotnes' reasons for plaintiffs' discharge were pretextual. *See Haskell v. Kaman Corp.*, 743 F.2d 113, 119 (2d Cir.1984) ("[A]s in race discrimination cases, a plaintiff may through statistical evidence establish a pattern or practice of discharging or failing to promote older employees, from which an inference of age discrimination may be drawn.")

Plaintiffs and defendants present their statistics somewhat differently. Plaintiffs' statistical evidence reflects the effect of the terminations on the "exempt" salaried workforce. Defendants, on the other hand, argue that any relevant sample must be drawn from the entire Grotnes workforce, exempt and non-exempt employees alike. Clearly, any distinction between exempt and non-exempt employees is irrelevant to this case.[4] A party may not categorize employees selectively in order to give rise to the desired inferences. *Parker v. Federal National Mortgage Association,* 741 F.2d 975, 980 (7th Cir.1984). Consequently, any relevant statistics must be based upon the entire Grotnes salaried workforce.

The relevant statistical data regarding the Grotnes workforce before and after the reduction in workforce is as follows:

| Age Group | # employees before 3/31/83 | # employees after 3/31/83 | Terminations |
|---|---|---|---|
| 25–39 | 21 (32%) | 18 (38%) | 3 (17%) |
| 40–65 | 44 (68%) | 29 (62%) | 15 (83%) |
| Total | 65 | 47 | 18 |

These figures indicate that more than three-quarters (83%) of the terminations consisted of individuals within the forty to seventy age group. In other words, "the over–40 workforce was forced to absorb almost the entire effect of the terminations." (Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment at 33.)

Moreover, the proportion of older workers in the group of discharged employees far exceeded the proportion of older workers in Grotnes' workforce on the date of the terminations. If Grotnes discharged employees at random from the population of salaried employees, the number of employees aged 40 to 70 chosen for termination would be proportional to the number of older employees in the population as a whole. Thus, had defendants chosen the eighteen terminees randomly, approximately 68% of those selected (or twelve of eighteen) would fall in the protected age group. By contrast, nearly 83% (or fifteen of eigh-

teen) of the group of employees who were actually discharged fell within the protected age group.

Defendants argue that these statistics are meaningless. Defendants claim that plaintiffs' data "lack sufficient breadth to be trustworthy," and is unreliable because "[a] small change in the underlying raw data would result in dramatic statistical fluctuations...." *Parker v. Federal National Mortgage Association,* 741 F.2d at 980–81. *See also International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 327, 97 S.Ct. 1843, 1850, 52 L.Ed. 2d 396 (1977) ("[c]onsiderations such as small sample size may, of course, detract from the value of [statistical] evidence.")

This court is aware that statistics in age discrimination cases are only significant when "the disparities in treatment are quite large." *Matthews v. Allis–Chalmers Corp.,* 769 F.2d 1215, 1218 (7th Cir.1985); *Kephart v. Institute of Gas Technology,* 630 F.2d 1217, 1224 (7th Cir.1980), *cert. denied,* 450 U.S. 959, 101 U.S. 1418, 67 L.Ed.2d 383 (1981). However, the sample presented is large enough to permit a jury to infer that Mack and Stettler intentionally discriminated and that their proffered reasons for plaintiffs' discharge were pretextual. The sample comprising 65 members of the Grotnes workforce is significantly larger than the sample which other courts have found to be too small. In *Haskell,* 743 F.2d at 121, for example, the Second Circuit found that ten terminations over an eleven year period was not statistically significant. *See also Pace v. Southern Railway System,* 701 F.2d 1383, 1389 (11th Cir.1983) (twelve employment decisions over twelve years too few to be meaningful); *Coble v. Hot Springs School District No. 6,* 682 F.2d 721 (8th Cir.1982) (sample of fifteen employment decisions over a course of eight years "too small to support any inference of a discriminatory pattern or practice"); *Turner v. Texas Instruments, Inc.,* 555 F.2d 1251, 1257 (5th Cir.1977) (eight employment decisions over

**4.** "Exempt" employees are those who are not covered by the minimum wage and overtime provisions of the Fair Labor Standards Act, 29 U.S.C. § 213. "Non-exempt" employees are not covered by these provisions. (Masek Aff. at 2.)

a two-year period too few to be meaningful).

■ In sum, plaintiffs have succeeded in raising a fact issue as to whether defendants' legitimate, nondiscriminatory reasons were merely a pretext for discriminating against plaintiffs because of their age. "[O]nce the plaintiff presents the court with some evidence that his employer harbored the prohibited motive, summary judgment for the defendant is inappropriate because there is a disputed fact material to the case." *Parker v. Federal National Mortgage Association*, 741 F.2d at 980. Consequently, plaintiffs' case is not wholly without merit. Summary judgment for the defendants on plaintiffs' disparate treatment claims must be denied.

### 2. *Disparate Impact*

■ Plaintiffs' complaint also asserts a claim of age discrimination under a disparate impact theory. To establish their prima facie case in a disparate impact claim of age discrimination, plaintiffs need show simply that a facially neutral employment practice in fact impacts more harshly upon a protected age group than upon others. *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1126 (7th Cir.1987); *Griffin v. Board of Regents*, 795 F.2d 1281, 1287 (7th Cir.1986); *Regner v. City of Chicago*, 789 F.2d 534, 538 (7th Cir.1986).

■ If plaintiffs succeed in establishing their prima facie case, the burden shifts to the defendant to prove either (1) that plaintiffs' statistics are deficient, or (2) that its employment practice is manifestly related to the job in question or significantly serves some important business purpose. *See e.g., Griffin v. Board of Regents*, 795 F.2d 1281, 1287 (7th Cir.1986). If the defendant meets this burden, the plaintiff may show that the employer was using the practice in question as a mere pretext for discrimination or that there are alternatives with a lesser discriminatory impact that would also serve the employer's legitimate interest. *Griffin v. Board of Regents*, 795 F.2d at 1287.

In this case, plaintiffs have not adequately articulated a disparate impact theory.

Defendants claim that Mack and Stettler made each of the termination decisions after "an evaluation of Grotnes' entire salaried workforce, and a determination of each salaried employees' ability, experience, past performance record, and future performance potential." (Defendants' Brief in Support of the Motion for Summary Judgment at 51.) Plaintiffs claim that these subjective criteria adversely impacted the age group protected by the ADEA. Plaintiffs seem to argue that because the terminations were made subjectively, they adversely affected older employees.

■ Plaintiffs' argument in effect seeks to transform a disparate treatment theory into a disparate impact one. However, the disparate impact theory is more appropriate in cases where plaintiffs challenge "well-defined, objective employment criteria." *Griffin v. Board of Regents*, 795 F.2d at 1289. Plaintiffs' assertion that defendants' subjectivity disproportionately impacted older employees implies that in making their termination decisions defendants acted with an element of discriminatory intent. Clearly, discriminatory motive is irrelevant in age discrimination cases based upon disparate impact. *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971).

Plaintiffs have not met their prima facie burden of showing that a facially neutral policy employed by defendants adversely impacted older workers. Because plaintiffs have failed to make a sufficient showing on an essential element of their case, defendants are entitled to summary judgment on plaintiffs' disparate impact claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

### B. Count II

■ Title VII makes it unlawful for an employer to discharge any individual "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). To adequately state a claim of discrimination under Title VII, a plaintiff has the burden of establishing a prima facie case of discrimination. *See*

*McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1972); *Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 510 (7th Cir.1986); *Flowers v. Crouch–Walker Corp.*, 552 F.2d 1277, 1282 (7th Cir.1977). As in an age discrimination case, the ultimate burden of proving that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1980); *Andre v. Bendix Corp.*, 774 F.2d 786, 792 (7th Cir.1985); *Bonilla v. Oakland Scavenger Co.*, 697 F.2d 1297, 1301 (9th Cir.1982).

The essence of plaintiffs' claim of discrimination based upon national origin is that in determining which salaried exempt employees to terminate, Mack and Stettler excluded from consideration the six Swiss Grotnes employees. Accordingly, plaintiffs assert that because they were Swiss, these six employees enjoyed a protected status which "operated to plaintiffs [sic] disadvantage by making it more likely that plaintiffs, who were without the protective garment of Swiss heritage, would be terminated." (Plaintiffs' Brief in Opposition to the Motion for Summary Judgment at 52.)

Even drawing all inferences in the light most favorable to plaintiffs, it is clear that plaintiffs have failed to show any indirect evidence from which a reasonable jury might infer discriminatory motive as to national origin. The fact that Grotnes did not terminate any Swiss employees during the workforce reduction certainly does not indicate discriminatory motive. At the time of the workforce reduction, Grotnes employed only five Swiss individuals in departments which experienced terminations. Any statistical imbalance which plaintiffs might attempt to show would be nonprobative because the sample size is too small to reflect statistical significance. *See Parker v. Federal National Mortgage Association*, 741 F.2d 975, 980–81 (7th Cir.1984).

Moreover, the direct evidence which plaintiffs present to prove Mack and Stettler's discriminatory intent is likewise insufficient to raise an inference of discrimination as to national origin. The fact that Grotnes continued to use a Swiss subcontractor despite Grotnes' financial trouble does not indicate that Grotnes more likely considered national origin than work performance in choosing terminees. Moreover, Grotnes did not exercise discriminatory motive by hiring a Swiss engineer six months prior to the plaintiffs' terminations.

Plaintiffs' evidence amounts to mere speculation and opinion. Consequently, summary judgment on plaintiffs' claim of national origin discrimination under Title VII must be granted in defendants' favor.

## C. Counts III and IV

In Count III, plaintiff Makowski claims that Grotnes violated the ADEA by deducting from his pension benefits the amount of his severance pay and also his insurance premiums for the period of April to October, 1983. In Count IV, Makowski claims that deducting these amounts constituted a breach of defendants' fiduciary duty as plan administrators in violation of ERISA. This court grants defendants' motion for summary judgment on Counts III and IV of plaintiffs' complaint.[5]

### 1. *Count Three—ERISA*

 Makowski's claim that defendants breached their fiduciary duty as plan administrators is without merit. Although trustees must administer employee pension funds solely in the interest of the fund's beneficiaries, 29 U.S.C. § 1104, the trustees are not constrained from exercising their best independent judgment in doing so. *Flinchbaugh v. Chicago Pneumatic Tool Co.*, 531 F.Supp. 110, 113 (W.D. Pa. 1982). Courts may not substitute their own judgment for that of the plan administrators; rather, courts must determine whether the decision of the administrators was in any

---

**5.** Makowski also points to two communications which demonstrate that Mack and Stettler's behavior toward Makowski was "less than honorable." (Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment at 60.) However, these actions were neither arbitrary and capricious nor evidence of age animus and are not discussed here.

way arbitrary or capricious. *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 208 (7th Cir.1985).

■ Grotnes' decision to deduct severance pay from Makowski's pension benefits was not arbitrary or capricious. Mack and Stettler adhered to the express provisions of the Plan in computing the amount of Makowski's regular pension. Paragraph 3.9 resembles provisions in other pension plans within the steel industry which have been found not to violate ERISA.[6] *See Vintilla v. United States Steel Corporation Plan*, 606 F.Supp. 640 (W.D.Pa.1985); *aff'd* 782 F.2d 1026, 1033 (3d Cir.), *cert. denied*, 475 U.S. 1141, 106 S.Ct. 1791, 90 L.Ed.2d 337 (1986).[7]

In light of Grotnes' poor financial health at the time of the terminations, Mack and Stettler exercised sound business judgment in electing not to duplicate Makowski's severance benefits. Thus, Mack and Stettler's decision was not arbitrary and capricious under the law.

### 2. *Count Four—Age Discrimination*

■ Simlarly, Mack and Stettler's decision did not violate the ADEA because Makowski was not adversely affected in any way by the provisions of the plan.

It is clear that "a benefit that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion even if the employer would be free ... not to provide the benefit at all." *Dorsch v. L.B. Foster Co.*, 782 F.2d 1421, 1427 (7th Cir.1986), quoting *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985). In order to prevail in an age discrimination claim under these circumstances, a plaintiff must present enough evidence to raise a suspicion of discrimination. *Henn v. National Geographic Society*, 819 F.2d 824, 828 (7th Cir.1987) (finding that "retirement is not itself a prima facie case of age discrimination.")

After the plaintiff sets forth his prima facie case, the defendant may present a defense to plaintiffs' claim by showing that the retirement plan constituted a bona fide employee benefit plan under Section 4(f)(2) of the ADEA, 29 U.S.C. § 623(f) (2). Section 4(f) (2) permits an employer "to observe the terms of a bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of [the ADEA]." Under Section 4(f)(2), the employer must show both a sound business purpose for the structure of the plan and the absence of "subterfuge." *Henn v. National Geographic Society*, 819 F.2d at 827.

This court need not reach the issue of whether the Plan constituted a bona fide retirement plan under Section 4(f)(2). It is clear from the Plan itself that plaintiff Makowski has failed to raise the requisite inference of discrimination as to the manner in which Grotnes computed his pension benefits.

---

**6.** Paragraph 3.9(a) of the Plan, entitled "Deduction for Severance Allowance," states:

> (a) If any participant is or shall become entitled to or shall be paid by discharge, liquidation or dismissal or severance allowance or payment of similar kind (hereinafter "severance allowance") by reason of any plan of the Company or its predecessor, ... then the total amount of such severance allowance paid or payable to him may, in the discretion of the Committee, be deducted from the amount determined in accordance with 3.3(b), (c), (d) and (e) and paragraphs 3.4 or 3.5 upon retirement; ... provided that the Company and the Committee shall administer this provision and the severance allowance policy in a consistent and nondiscriminatory manner as among participants covered by this Plan.

**7.** Makowski also claims that Grotnes violated ERISA and the ADEA by deducting his insurance premiums from his pension benefits.

Paragraph 8.3 of the Plan, entitled "Deduction for Overpayments and Insurance Premiums," states:

> Notwithstanding the provisions of paragraph 8.2,
>
> . . . . .
>
> (b) upon authorization by a participant on a form provided by the Committee, the amount of premium payable to him for hospitalization and physicians' services coverage upon retirement shall be deducted from any pension payable under this Plan.

On June 1, 1983 Makowski signed a card which authorized Grotnes to deduct his insurance premiums from his benefits. (Makowski Dep.Ex. 17.) Thus, Makowski's claim is without merit.

According to its terms, the Plan neither excluded Makowski because of his age nor treated him adversely because of his age. *See Henn v. National Geographic Society*, 819 F.2d at 827. In *Henn*, the defendant offered every salesman over the age of 55 the opportunity of early retirement with severance and retirement benefits. Plaintiffs sued under the ADEA, claiming that this offer violated the ADEA because it discriminated against them on the basis of their age. The court disagreed on the grounds that defendants' discrimination had actually benefitted plaintiffs because they could take advantage of the enhanced retirement package.

The situation in the instant case is similar. Makowski was the only plaintiff who was in a position to take advantage of Grotnes' pension package at the time of his termination.[8] Because he applied for early retirement, he received more benefits from Grotnes than did the individuals who could not qualify for the early retirement package.[9] Because Makowski cannot show that he was adversely affected by Grotnes' decision to deduct his severance pay, he has failed to carry his prima facie burden. As a result, summary judgment is granted in defendants' favor on Counts III and IV of plaintiffs' complaint.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion to substitute the Estate of John G. Mack, Jr., with Catherine Mack as executrix, as defendant in this cause of action is GRANTED. Defendants' motion for summary as to Counts II, III and IV is GRANTED. Defendants' motion for summary judgment as to Count I is DENIED. The parties are strongly encouraged to discuss settlement and report on the status thereof on February 9, 1988 at 10:00 a.m.

---

**8.** One other individual, William Hewitt, also qualified for early retirement at the time of the workforce reduction, but he opted to retire before receiving his notice of termination. (Stettler Dep. at 283.) Thus, Mr. Hewitt did not receive severance pay and none was deducted from his pension benefits.

**9.** Makowski's benefit amounted to nearly $3,000 in the first six months of his retirement alone. If Makowski had not applied for his retirement benefits after his termination, he would have kept his severance pay of $6,392.40. If he had retired without accepting his severance pay, he would have received $9,340.23 during the first six months and then $1,396.00 per month thereafter. From these figures it is clear that in the first six months alone Makowski *benefitted* from the early retirement provision in the Plan by nearly $3,000.00.